Slip Op. 14-139

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| RUBBERMAID COMMERCIAL PRODUCTS, LLC (successor in interest to TECHNICAL CONCEPTS, LLC), <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Mark A. Barnett, Judge <br><br> Court No. 10-00116 |

OPINION

[The court finds that the subject imports are properly classified as "electrical machines and apparatus" under heading 8543 and are not classified under heading 8424. Accordingly, the court denies Plaintiff's motion for summary judgment and grants Defendant's cross-motion for summary judgment.]

Dated: December 2, 2014

*Thomas J. O'Donnell*, *Jessica R. Rifkin*, and *Lara A. Austrins*, Clark Hill PLC of Chicago, Illinois, for Plaintiff Rubbermaid Commercial Products, LLC.

*Stuart F. Delery*, Assistant Attorney, *Amy Rubin*, Assistant Director, International Trade Field Office, *Saul Davis*, Senior Trial Counsel, Civil Division, Department of Justice, and *Aimee Lee*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, New York, for Defendant United States.  Of counsel on the briefs was *Chi S. Choy*, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Barnett, Judge:  The case is before the court on cross-motions for summary judgment.  Plaintiff, Rubbermaid Commercial Products, LLC ("Rubbermaid"), successor in interest to importer of record Technical Concepts, LLC, contests the denial of two protests in which U.S. Customs and Border Protection ("Customs") reliquidated the

subject imports under subheading 8543.90.88 of the Harmonized Tariff Schedule of the United States ("HTSUS") as "electrical machines and apparatus."  Rubbermaid contends that Customs should have classified the subject imports under subheading 8424.90.90, as mechanical appliances for dispersing liquids.  Defendant, United States, asserts that Customs correctly reliquidated the subject imports under subheading 8543.90.88.

No genuine issue of material fact exists regarding the properties of the subject imports or how they operate.  Thus, the sole issue before the court is whether, as a matter of law, the subject imports should be classified under heading 8543 or under heading 8424.[1]  For the reasons discussed below, the court holds that Customs correctly classified the subject imports as "electrical machines and apparatus" subject to heading 8543 and, therefore, denies Rubbermaid's motion for summary judgment and grants the United States' cross-motion for summary judgment.

## BACKGROUND AND PROCEDURAL HISTORY

### I.  Overview of the Subject Imports

The subject imports are parts of TCell and SaniCell Tank products.  (Pl.'s Material Facts ("Pl.'s Facts") ¶ 3; Def.'s Resp. Material Facts ("Def.'s Resp. Facts") ¶ 3.) A TCell dispenses a flow of fragrance oil to scent the air of public restrooms.  (Pl.'s

---

[1] If the court determines that neither proposed heading applies to the subject imports, the court must identify the appropriate heading.  *EOS of N. Am., Inc. v. United States*, 37 CIT __, __, 911 F. Supp. 2d 1311, 1317-18 (2013) (quoting *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984)); *see also Latitudes Int'l Fragrance, Inc. v. United States*, 37 CIT __, __, 931 F. Supp. 2d 1247, 1252 (2013).

Facts ¶¶ 10-12, 32; Def.'s Resp. Facts ¶¶ 10-12, 32.)  A SaniCell delivers cleaning

liquid into the water stream of a toilet or urinal.  (Stipulation of Facts ("Stip.") ¶¶ 10, 12.)

## II.  The Parts at Issue

The parts at issue in this case are dispensers and refills, which together

comprise complete TCells and SaniCells.  (Stip. ¶¶ 1, 11; Pl.'s Facts ¶¶ 4-5; Def.'s

Resp. Facts ¶¶ 4-5.)  In both products, a refill is inserted into a dispenser, after which an

electrochemical cell ("fuel cell") produces hydrogen gas which pushes liquid fragrance

or cleaner out of the TCell or SaniCell.  (Stip. ¶¶ 1, 6, 11-13; Pl.'s Facts ¶¶ 13, 16, 36-

37; Def.'s Resp. Facts ¶¶ 13, 16, 36-37.)

### A.  Description of the TCell Parts at Issue

A TCell dispenser houses a TCell refill.  (Stip. ¶ 1.)  The dispenser has a plate

that mounts to a bathroom wall, a front cover that opens by means of a hinge, and a

circuit board assembly.  (Pl.'s Facts ¶ 15; Def.'s Resp. Facts ¶ 15.)  The circuit board

assembly consists of a circuit board, a coil spring, two "V"-shaped leaf springs, two

resistors, and a switch to select a resistor setting.  (Pl.'s Facts ¶ 15; Def.'s Resp. Facts

¶ 15.)  The resistor settings regulate the rate at which hydrogen is produced, which in

turn affects the rate at which liquid is dispensed.  (Pl.'s Facts ¶ 15; Def.'s Resp. Facts

¶ 15.)  The dispenser does not have any means to connect to an external power supply.

(Pl.'s Facts ¶ 17; Def.'s Resp. Facts ¶ 17.)

The TCell refill cartridge consists of a fuel cell secured in place by a metal cap, a

rubber ring surrounding the fuel cell, and a cartridge head which holds the fuel cell and

rubber ring in place.  (Pl.'s Facts ¶ 18; Def.'s Resp. Facts ¶ 18.)  The refill also includes

an upper and lower chamber separated by a hydrogen-permeable shield.  (Stip. ¶ 3;

Pl.'s Facts ¶ 18; Def.'s Resp. Facts ¶ 18.)  The upper chamber sits below the fuel cell.

(Pl.'s Facts ¶ 18; Def.'s Resp. Facts ¶ 18.)  The lower chamber contains fragrance oil.

(Pl.'s Facts ¶¶ 4; 18; Def.'s Resp. Facts ¶¶ 4, 18.)  At the bottom of the fragrance

chamber, an orifice plug ("restrictor") with small grooves creates "a tortuous path for

liquid fragrance," preventing the fluid from leaving the chamber absent sufficient

pressure.  (*See* Stip. ¶ 6; Pl.'s Facts ¶¶ 18, 31; Def.'s Resp. Facts ¶¶ 18, 31.)  A plastic

cup encloses the bottom of the refill cartridge, including the restrictor, and surrounds the

lower portion of an emanator pad, which is made of an absorbent material.  (Pl.'s Facts

¶ 18; Def.'s Resp. Facts ¶ 18.)  A plastic pull tab seals the plastic cup until a TCell user

removes it when inserting a refill into a dispenser.  (*See* Pl.'s Facts ¶ 19; Def.'s Resp.

Facts ¶ 19.)

### B. Description of the SaniCell Parts at Issue

A SaniCell dispenser houses a SaniCell refill.  (Stip. ¶ 11; Pl.'s Facts ¶¶ 36, 40;

Def.'s Resp. Facts ¶¶ 36, 40.)  The dispenser includes a refill cartridge housing unit, a

latching cover, and a resistor assembly, consisting of a resistor and two metal springs.

(Stip. ¶ 11; Pl.'s Facts ¶ 37; Def.'s Resp. Facts ¶ 37; Pl.'s Mot. Summ. J. 4; Def.'s Cross

Mot. 3.)  It does not incorporate any means to connect to an external power supply.

(Pl.'s Facts ¶ 38; Def.'s Resp. Facts ¶ 38.)

The SaniCell refill includes a fuel cell which is secured in place by a metal cap, a

rubber ring around the fuel cell, and a cartridge head which holds the fuel cell and

rubber ring in place.  (Pl.'s Facts ¶¶ 39-40; Def.'s Resp. Facts ¶¶ 39-40.)  The refill also

has a chamber in which gas generated by the fuel cell accumulates, a chamber which contains cleaning fluid, a restrictor between these two chambers, and a part[2] that prevents liquid cleaner from flowing out of the refill until the refill is placed in the dispenser.  (Pl.'s Facts ¶¶ 39-40; Def.'s Resp. Facts ¶¶ 39-40.)  The gas chamber is located immediately below the fuel cell, which produces hydrogen through an electrochemical process.  (Pl.'s Facts ¶ 39; Def.'s Resp. Facts ¶ 39.)  When sufficient pressure builds, hydrogen can pass around the restrictor through grooves on the restrictor's outside surface into the fluid chamber.  (Pl.'s Facts ¶ 46; Def.'s Resp. Facts ¶ 46.)  The bottom of the liquid chamber connects to a delivery tube, through which liquid cleaner passes when hydrogen gas displaces it from the fuel chamber.  (Pl.'s Facts ¶ 46; Def.'s Resp. Facts ¶ 46; Pl.'s Mot. Summ. J. 4; Def.'s Cross Mot. 4.)

### III. Operation of the TCells and SaniCells

The TCell and SaniCell function through pressure that builds when a fuel cell produces hydrogen gas.  (*See* Stip. ¶ 6; Pl.'s Facts ¶¶ 18, 31; Def.'s Resp. Facts ¶¶ 18, 31.)  As the fuel cell produces more hydrogen, the resulting pressure respectively forces fragrance and cleaning fluid out of the TCell's fragrance chamber and the SaniCell's liquid chamber.  (Stip. ¶ 13.)

---

[2] Rubbermaid claims that this part is a ball and spring check valve assembly.  (Pl.'s Facts ¶¶ 39-40.)  The United States alleges that it is actually "a bottle cap/closure that is opened when the refill is ready for use."  (Def.'s Resp. Facts ¶ 39.)  This dispute is not material to the court's analysis because, as discussed *infra*, the part is ancillary to the operation of the SaniCell.

### A. Operation of the TCell

TCells operate by means of an electrochemical process that produces hydrogen. (Stip. ¶ 13.)  The fuel cell contains zinc and water, and has a cathode and an anode. (Stip. ¶ 5; *see* Pl.'s Facts ¶¶ 21-22; Def.'s Resp. Facts ¶¶ 21-22.)  A circuit forms between the cathode and the anode when the TCell refill is placed in the TCell dispenser.  (Stip. ¶ 5; *see* Pl.'s Facts ¶¶ 20-22; Def.'s Resp. Facts ¶¶ 20-22.)  An electrically-conductive cap in the dispenser holds the refill's fuel cell in place and comes into contact with the cathode of the fuel cell.  (Stip. ¶ 5; *see also* Pl.'s Facts ¶¶ 20-21; Def.'s Resp. Facts ¶¶ 20-21.)  When the dispenser's front housing cover is closed over the refill, a coil spring on the circuit board assembly contacts the anode portion of the fuel cell.  (Stip. ¶ 5; *see also* Pl.'s Facts ¶¶ 20-21; Def.'s Resp. Facts ¶¶ 20-21.)  Two leaf springs also contact the cap which is in contact with the cathode, thereby completing a circuit between the anode and cathode portions of the fuel cell.  (Stip. ¶ 5; Joint Statement Describing Electrochemical Process ("Joint Statement") ¶ 3; *see also* Pl.'s Facts ¶¶ 20-21; Def.'s Resp. Facts ¶¶ 20-21.)  This circuit generates a spontaneous electrochemical reaction between the zinc and water in the fuel cell.  (Pl.'s Facts ¶¶ 21-22; Def.'s Resp. Facts ¶¶ 21-22; Joint Statement ¶¶ 1, 4.)  The formula $Zn + H_2O = ZnO + H_2$ summarizes the reaction.  (Pl.'s Facts ¶ 22; Def.'s Resp. Facts ¶ 22.)  The reaction oxidizes zinc at the anode to produce zinc oxide, water, and two free electrons.  (Joint Statement ¶¶ 2, 5.)  The two electrons created during this reaction flow through the circuit to the fuel cell's cathode, where they react with the water to produce hydroxyl ions and the desired hydrogen gas.  (Joint Statement ¶¶ 4-6.)  The reaction

consumes all the electrons it creates and no electrons enter the system from an

external source.  (Pl.'s Facts ¶ 26; Def.'s Facts ¶ 26; Joint Statement ¶ 1.)  No hydrogen

gas is produced unless the circuit between the cathode and anode is closed, permitting

the flow of electrons and the spontaneous oxidation-reduction reaction between the zinc

and the water.  (Joint Statement ¶ 4.)  By selecting a resistor setting, which controls the

rate at which the electrochemical reaction occurs, a user can determine whether the

refill lasts 30, 60, or 90 days.  (Joint Statement ¶ 7.)

As the electrochemical reaction creates hydrogen gas, pressure builds in the

TCell refill's upper chamber.  (Stip. ¶ 6; *see* Pl.'s Facts ¶¶ 22, 28-30; Def.'s Resp. Facts

¶¶ 22, 28-30.)  When the pressure is sufficient, the hydrogen gas flows from the upper

chamber through the hydrogen-permeable shield into the lower chamber.  (Stip. ¶ 6;

*see* Pl.'s Facts ¶¶ 22, 28-30; Def.'s Resp. Facts ¶¶ 22, 28-30.)  The hydrogen gas

displaces fragrance oil in that chamber and pushes it through the restrictor.  (Stip. ¶ 6;

*see* Pl.'s Facts ¶ 31; Def.'s Resp. Facts ¶ 31.)  The displaced fragrance oil accumulates

in a cup at the bottom of the TCell refill, where the emanator pad absorbs it.  (Pl.'s Facts

¶ 32; Def.'s Resp. Facts ¶ 32.)  The fragrance oil diffuses across the emanator pad, and

the oil's scent spreads throughout a restroom with the movement of the surrounding air.

(Pl.'s Facts ¶ 32; Def.'s Resp. Facts ¶ 32.)  This process continues until the

electrochemical process consumes all of the zinc and water in the fuel cell.  (Pl.'s Facts

¶ 33; Def.'s Resp. Facts ¶ 33.)

## B. Operation of the SaniCell

The SaniCell functions similarly.  When a SaniCell refill cartridge is inserted into

a SaniCell dispenser, the two metal springs in the dispenser's resistor come into contact

with the refill's fuel cell.  (Pl.'s Facts ¶ 37; Def.'s Resp. Facts ¶ 37.)  These contacts

create a complete circuit that initiates an electrochemical reaction inside the fuel cell.

(Pl.'s Facts ¶ 41; Def.'s Resp. Facts ¶ 41.)  As in the TCell, this electrochemical reaction

creates hydrogen gas which moves through a restrictor which divides the SaniCell

refill's two chambers.  (Stip. ¶ 12; Pl.'s Facts ¶¶ 41, 46; Def.'s Resp. Facts ¶¶ 41, 46.)

The gas displaces the cleaning fluid in the liquid chamber, pushing it through a delivery

tube and into the water stream supplying a toilet or urinal.  (Stip. ¶ 12; Pl.'s Facts ¶ 46;

Def.'s Resp. Facts ¶ 46.)  The cleaning liquid moves throughout the toilet or urinal with

the flow of the toilet or urinal water.  (Stip. ¶ 12; Pl.'s Facts ¶ 46; Def.'s Resp. Facts

¶ 46; Pl.'s Mot. Summ. J. 4-5; Def.'s Cross Mot. 4.)

## IV. Procedural History

This case involves six entries of merchandise, consisting of dispenser and refill

parts of TCells and SaniCells, imported between 2007 and 2008.  (Pl.'s Facts ¶¶ 2-3;

Pl.'s Mot. Summ J. Ex. A; Def.'s Resp. Facts ¶¶ 2-3.)  Customs liquidated the TCell

dispensers in 2008 under subheading 3926.90.99, HTSUS, as plastic housings, and the

TCell refills under subheading 3307.49.00, HTSUS, as fragrance refills.  (Pl.'s Facts ¶ 6;

Def.'s Resp. Facts ¶ 6.)  It liquidated the SaniCell dispensers in 2008 under subheading

3926.90.99, HTSUS, as plastic housings, and the refills under subheading 3307.49.00,

HTSUS, as cleaner refills.  (Pl.'s Facts ¶ 7; Def.'s Resp. Facts ¶ 7.)  In 2009 and 2010,

Customs reliquidated the merchandise under subheading 8543.90.88, as "electrical

machines or apparatus, having individual functions, not specified or included elsewhere

in this chapter; parts thereof."[3]  (Pl.'s Facts ¶ 8: Def.'s Resp. Facts ¶ 8.)

Technical Concepts, LLC, the importer of record, timely filed protests of these

reliquidation classifications.[4]  (Pl.'s Facts ¶ 1; Def.'s Facts ¶ 1; *see also* Pl.'s Mot.

Summ. J. 7-8; Def.'s Resp. 5-6; *see also* Protest Nos. 3901-09-100784 and 3901-09-

100133.)  On December 14, 2009, Customs denied the TCell protest and reaffirmed that

TCell parts fall under heading 8543, as parts of electrical machines or apparatus.

HQ H033518.  On January 8, 2010, Customs likewise denied the SaniCell protest and

reaffirmed that SaniCell parts fall under heading 8543.  (Pl.'s Mot. Summ. J. 9; Def.'s

Cross Mot. 5.)  As successor in interest to Technical Concepts, LLC, Rubbermaid now

challenges the denial of these protests.  The parties have fully briefed the issues.  Oral

argument was held on September 17, 2014, at which certain clarifications of fact were

requested and, subsequently, received.  The court now rules on the parties' respective

motions for summary judgment.

---

[3] Customs determined that the original classifications were inappropriate because imports that are solely or principally used as parts of goods falling under a heading of Chapter 84 or 85 should be classified under that heading.  Note 2(b) to Section XVI.  If complete TCells and SaniCells are properly classified in Chapter 84 or 85, then parts of the TCells and SaniCells also must be classified in Chapter 84 or 85.  Plaintiff does not claim that the original classifications were correct.

[4] Technical Concepts, LLC also timely filed a protest of the original classification of the TCells and SaniCells under heading 3926.  (Pl.'s Mot. Summ. J., Ex. A.)  However, that protest is not material to the present action.

## JURISDICTION AND STANDARD OF REVIEW

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(a).  It may

grant summary judgment when "there is no genuine issue as to any material fact,"

USCIT R. 56(a), and "the moving party is entitled to judgment as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Mingus Constructors, Inc. v.*

*United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).

The court's review of a classification decision involves two steps.  First, it must

determine the meaning of the relevant tariff provisions, which is a question of law.  *See*

*Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citation

omitted).  Second, it must determine whether the merchandise at issue falls within a

particular tariff provision as construed, which is a question of fact.  *Id.* (citation omitted).

When no factual dispute exists regarding the import, resolution of the classification turns

solely on the first step.  *See id.* at 1365-66; *see also Carl Zeiss, Inc. v. United States*,

195 F.3d 1375, 1378 (Fed. Cir. 1999).

The court reviews classification decisions *de novo*.  *See* 28 U.S.C. §§ 2640(a),

2643(b).  While the court accords deference to Customs classification rulings relative to

their '"power to persuade,"' *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)

(quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)), it has "an independent

responsibility to decide the legal issue of the proper meaning and scope of HTSUS

terms."  *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005)

(citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

The court first considers whether "the government's classification is correct, both

independently and in comparison with the importer's alternative." *Jarvis Clark Co. v.*

*United States*, 733 F.2d 873, 878 (Fed. Cir.1984).  If the court concludes that the

government's classification is incorrect, then the court must determine the correct

classification.  *Id.*

## DISCUSSION

The General Rules of Interpretation ("GRIs") provide the analytical framework for

the court's classification of goods.  *See N. Am. Processing Co. v. United States*, 236

F.3d 695, 698 (Fed. Cir. 2001).  "The HTSUS is designed so that most classification

questions can be answered by GRI 1." *Telebrands Corp. v. United States*, 36 CIT __,

__, 865 F. Supp. 2d 1277, 1280 (2012).  GRI 1 states that "for legal purposes,

classification shall be determined according to the terms of the headings and any

relevant section or chapter notes."  HTSUS, GRI 1.  The court must consider Chapter

and Section Notes of the HTSUS in resolving classification disputes because they are

statutory law, not interpretive rules.  *See Libas, Ltd. v. United States*, 193 F.3d 1361,

1364 (Fed. Cir. 1999).

"Absent contrary legislative intent, HTSUS terms are to be 'construed [according]

to their common and popular meaning.'" *Baxter Healthcare Corp. v. United States*, 182

F.3d 1333, 1337 (Fed. Cir. 1999) (brackets in original) (quoting *Marubeni Am. Corp. v.*

*United States*, 35 F.3d 530, 533 (Fed. Cir. 1994)).  Courts may rely upon their own

understanding of terms and/or consult dictionaries, encyclopedias, scientific authorities,

and other reliable information.  *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786,

789 (Fed. Cir. 1988); *BASF Corp. v. United States*, 35 CIT __, __, 798 F. Supp. 2d

1353, 1357 (2011).  For additional guidance on the scope and meaning of tariff

headings and Notes, the court also may consider the Explanatory Notes ("EN") to the

Harmonized Commodity Description and Coding System, developed by the World

Customs Organization.  *See Deckers Outdoor Corp. v. United States*, 714 F.3d 1363,

1367 n.1 (Fed. Cir. 2013).  Although Explanatory Notes do not bind the court's analysis,

they are "indicative of proper interpretation" of the tariff schedule.  *Id.* (quoting H.R. Rep.

No. 100-576, at 549 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582)

(quotation marks omitted); *see also E.T. Horn Co. v. United States*, 367 F.3d 1326,

1329 (Fed. Cir. 2004) (citing *Len-Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309

(Fed. Cir. 2003)).  Interpretation of Explanatory Notes speaks to statutory construction

and thus are questions of law.  *Goldhofer Trailers USA, Inc. v. United States*, 7 CIT 141,

142 (1984) (citations omitted).

**I.   Tariff Headings at Issue**

On reliquidation, Customs determined that the subject imports are electrical

machines, falling within subheading 8543.90.88.  This subheading states:

**8543**   Electrical machines and apparatus, having individual functions, not
            specified or included elsewhere in this chapter; parts thereof:

        8543.90       Parts:

            8543.90.88   Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.6%

Rubbermaid alleges, however, that Customs improperly classified the subject

imports as "electrical machines and apparatus" covered by heading 8543.  (Pl.'s Mot.

Summ. J. 12-14.)  Rubbermaid denies that the subject imports function by means of

electricity, contending instead that they operate mechanically to disperse liquids,

thereby satisfying the criteria for classification within heading 8424.  (Pl.'s Mot. Summ.

J. 10-12.)  It contends that the subject imports are properly classified under subheading

8424.90.90 as mechanical appliances for dispersing liquids.  This provision states:

> **8424**   Mechanical appliances (whether or not hand operated) for projecting,
> dispersing or spraying liquids or powders; fire extinguishers, whether or
> not charged; spray guns and similar appliances; steam or sand blasting
> machines and similar jet projecting machines; parts thereof:
>
> 8424.90       Parts:
>
> 8424.90.90   Other: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FREE

The United States responds that the subject imports are not "mechanical

appliances" and do not disperse liquid.  (Def.'s Cross Mot. 16-27.)  The United States

argues that any mechanical feature of TCells and SaniCells is subsidiary to the

products' electrical function, such that they should remain classified in the basket

provision for electrical machines, heading 8543.  (Def.'s Cross Mot. 21 n.15; Def.'s

Reply 14-16.)

If TCells and SaniCells do not disperse liquid, as required to be classified under

heading 8424, they may meet the criteria to fall in the basket provision for Chapter 84,

heading 8479.  The relevant subheading covers:

> **8479**   Machines and mechanical appliances having individual functions, not
> specified or included elsewhere in this Chapter; parts thereof:
>
> 8479.90       Parts:
>
> 8479.90.94   Other: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FREE

If the court determines that the subject imports do not disperse liquid, and so are not

classified under heading 8424, it will have to determine whether the basket provision for

electrical machines, heading 8543, or machines and mechanical appliances, heading

8479, applies.  Understanding the relationship between the competing Chapters is

central to that determination.

## II.  Relationship Between the Competing Classifications

The parties' proposed tariff headings fall under Chapters 84 and 85 of Section

XVI, HTSUS.  Section XVI covers, among other things, "machinery and mechanical

appliances; electrical equipment; parts thereof."  Within Section XVI, Chapter 84

generally covers "nuclear reactors, boilers, machinery and mechanical appliances; parts

thereof," while Chapter 85 includes "electrical machinery and equipment and parts

thereof."  The relationship between Chapters 84 and 85 is thus central to the court's

analysis.

Neither Section XVI's Notes, nor the related Explanatory Notes, discuss the

relationship between Chapters 84 and 85.  The Notes do, however, confirm that parts,

"if suitable for use solely or principally with a particular kind of machine . . . are to be

classified with the machines of that kind."  Notes to Section XVI.  Section XVI's Notes

also establish a broad definition of the term "machine," indicating that it "means any

machine, machinery, plant, equipment, apparatus or appliance cited in the headings of chapter 84 or 85."[5]  Notes to Section XVI.

The court next looks to the individual Chapter Notes for relevant guidance.  The Notes to Chapter 84 state that "a machine the principal purpose of which is not described in any heading or for which no one purpose is the principal purpose is, unless the context otherwise requires, to be classified in heading 8479."  Notes to Chapter 84.  These Notes dictate that a machine is to be classified in one of the headings of Chapter 84 based on its principal purpose or in the Chapter's basket provision, 8479, if none of the chapter headings specifically describes the machine's principal purpose.  *See id.*  Heading 8479 broadly covers "[m]achines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter."  The Chapter Notes do not provide direction about the relationship between Chapters 84 and 85.

However, Chapter 84's Explanatory Notes provide guidance on differentiating between machines in Chapters 84 and 85.  They indicate that "[i]n general, Chapter 84 covers machinery and mechanical apparatus and Chapter 85 electrical goods," with the qualification that "certain machines are specified in headings of Chapter 85 . . . while Chapter 84 on the other hand covers certain non-mechanical apparatus."  EN to Chapter 84.  They further state that Chapter 84 "covers all machinery and mechanical appliances, and parts thereof, not more specifically covered by Chapter 85."  *Id.*

---

[5] The parties do not dispute that the goods at issue are parts to TCells and SaniCells, or that the complete TCells and SaniCells comprise machines for the purposes of classification in Section XVI.  (*See* Pl.'s Facts ¶¶ 47-48; Def.'s Resp. Facts ¶¶ 47-48.)

(emphasis removed).  To that end, "[i]t should also be noted that machinery and apparatus of a kind covered by Chapter 84 remain in this Chapter even if electric."  *Id.* The Explanatory Notes thus suggest that, as a general rule, a machine may be classified in a heading of Chapter 85 according to its principal function.  *See id.* However, the machine's classification will properly lie in Chapter 84 if it is of a kind covered by that Chapter, even if the machine includes electrical features, absent a more specific heading in Chapter 85.  *See id.*

Turning to Chapter 85, the Explanatory Notes state that "[t]his Chapter covers all electrical machinery and equipment, other than: . . . [m]achinery and apparatus of a kind covered by Chapter 84, which remains classified there even if electric."  EN to Chapter 85 (emphasis removed).  However, if a machine is not excluded from Chapter 85 because it is described specifically by a heading of Chapter 84, the machine may be classified in Chapter 85 to the extent that it "depend[s] for [its] operation on the properties or effects of electricity."  *Id.*  Thus, machines that depend on the properties or effects of electricity to operate may be classified in Chapter 85, unless they are described specifically by a heading of Chapter 84.  *See id.*

Within Chapter 85, heading 8543, the basket provision, is at issue.  The related Explanatory Notes provide that the heading "covers all electrical appliances and apparatus, not falling in any other heading of this Chapter, nor covered more specifically by a heading of any other Chapter of the Nomenclature . . . .  The principal electrical goods covered more specifically by other Chapters are electrical machinery of Chapter 84 . . . ."  EN to 8543 (emphasis removed).  This explanation echoes that of the

Explanatory Notes to Chapter 85, indicating that a machine is covered by Chapter 84,

even if it is electric, if a specific heading of Chapter 84 covers it.   EN to Chapter 85.

"However, the heading [8543] also includes electrical goods incorporating mechanical

features provided that such features are subsidiary to the electrical function of the

machine or appliance."  EN to 8543 (emphasis removed).  Therefore, certain electrical

machines may fall under Chapter 85's basket provision.

       The statement that Chapter 85's basket provision covers certain electrical

machines not otherwise specified stands in contrast to the broad language in the

Explanatory Notes to Chapter 84 suggesting that Chapter 84's basket provision is the

default heading for machines not specifically covered in Chapters 84 and 85.  *Compare*

EN to 8543, *with* EN to Chapter 84.  However, taking the Explanatory Notes to Chapter

84 to their logical extreme would require Chapter 84's basket provision to consume

Chapter 85's basket provision.  The Explanatory Notes to heading 8543 acknowledge

that the heading operates in juxtaposition to heading 8479, stating that "[t]he

introductory provisions of Explanatory Note to heading 84.79 concerning machines and

mechanical appliances having individual functions apply, *mutatis mutandis*, to the

appliances and apparatus of this heading."  EN to 8543.  However, the Explanatory

Notes do not suggest a resolution when one is called upon to elect between the two

chapters' basket provisions in classifying a machine.  *See id.*  Though the Explanatory

Notes to Chapter 84 suggest that a machine not specified elsewhere in Chapter 84 or

85 should default to heading 8479, the context would appear to require that an electrical

machine be classified in heading 8543 if its mechanical features are subsidiary to the

electrical function of the machine or appliance.  *See* EN to Chapter 84 (indicating that a

machine defaults to heading 8479 if it does not serve a principal function described in a

specific heading of Chapters 84 or 85 "unless the context otherwise requires"); *see also*

EN to 8543.

### III. Specific Headings of Chapters 84 and 85

The parties have not proposed, and the court has not identified, a specific

heading in Chapter 85 that describes the principal function of TCells and SaniCells.

Therefore, the court concludes that the subject imports do not fall under an *eo nomine*

provision of Chapter 85.  The court therefore considers whether TCells and SaniCells

fall under a specific heading of Chapter 84, as the Notes to Chapter 84 require.  *See*

Notes to Chapter 84 (indicating that a machine should be classified based on its

principal use in a heading of Chapter 84 if its principal use is not described in Chapter

85).

Rubbermaid proposes one such specific heading of Chapter 84.  It contends that

TCells and SaniCells should be classified under heading 8424, as "[m]echanical

appliances . . . for . . . dispersing or spraying liquids."  (*See generally* Pl.'s Mot. Summ.

J.)  The United States responds that TCells and SaniCells do not "disperse" liquids

because the fragrance and cleaning fluids enter the ambient environment passively

after being dispensed from the devices.  (Def.'s Cross Mot. Summ. J. 4, 23-28.)  Relying

on various Customs rulings, Rubbermaid contends that TCells and SaniCells disperse

liquids by releasing drips of cleaning or fragrance fluid, and thus fall under heading

8424.  (*See, e.g.*, Pl.'s Resp. 38.)  The Explanatory Notes to heading 8424 explain that

"[t]his heading covers machines and appliances for projecting, dispersing or spraying steam, liquids or solid materials . . . in the form of a jet, a dispersion (whether or not in drips) or a spray."  EN to 8424.  As this dispute centers on the interpretation of the term "dispersing" in heading 8424, it presents a question of statutory interpretation for the court.  *See Bausch*, 148 F.3d at 1365-66; *see also Carl Zeiss*, 195 F.3d at 1378.

Customs has considered the meaning of "disperse" for purposes of heading 8424, particularly in comparison to "dispense."  In January 2012, they issued Customs Ruling HQ H103965, stating that:

> [t]he functions performed under heading 8424—projecting, dispersing, or spraying liquids—are different than the function of dispensing a liquid. According to lexicographic authority, the definition of disperse is to spread or distribute widely from a fixed or constant source, to scatter, to distribute more or less evenly through a medium.  The definition of dispense is to deal out in portions.

(Pl.'s Mot. Summ. J. Ex. L.)  This Ruling offers a persuasive interpretation consistent with the plain meanings of "disperse" and "dispense."  *See Mead*, 533 U.S. at 235.  For example, the *Oxford English Dictionary* defines "disperse" as "[t]o cause to separate in different directions; to throw or drive about in all directions, to scatter; to rout" and "[t]o send off or cause to go in different directions."  Oxford English Dictionary (2014), *available at* http://www.oed.com/view/Entry/55006?rskey=5mDTOk&result=2&isAdvanced=false#eid (last visited Nov. 12, 2014); *accord* Merriam-Webster Dictionary (2014), *available at* http://www.merriam-webster.com/dictionary/disperse (defining "disperse" as "to spread or distribute from a fixed or constant source").  In contrast, the *Oxford English Dictionary*

defines "dispense" as "[t]o mete out, deal out, distribute; to bestow in portions or from a

general stock."  Oxford English Dictionary (2014), *available at*

http://www.oed.com/view/Entry/54981?rskey=u9wnl0&result=3#eid (last visited Nov. 12,

2014); *accord* Merriam-Webster Dictionary (2014), *available at* http://www.merriam-

webster.com/dictionary/dispense (last visited Nov. 12, 2014) (defining "dispense" as "to

deal out in portions").

 Rubbermaid urges that the Explanatory Notes to heading 8424 provide

persuasive examples of products that disperse through drips.  In particular, the

Explanatory Notes reference irrigation systems such as "dripper lines incorporating

drippers."  (Pl.'s Resp 38.)  However, "dripper lines" release liquids in drips at multiple

points through a network of pipes or hoses, thereby satisfying the definition of

"disperse," which requires scattering or release in different directions.  In contrast,

TCells and SaniCells dispense cleaning fluid or fragrance oil to a single point, passively

permitting air and water currents to carry the liquid in different directions.

The court concludes that the principal function of TCells and SaniCells is not to

disperse liquid and, therefore, they are not properly classified under heading 8424.  The

court further concludes that no other specific heading of Chapter 84 describes the

principal function of the machines in this case.

### IV. Basket Provisions of Chapters 84 and 85

Because TCells and SaniCells do not fall under an *eo nomine* provision of

Chapter 84 or 85, the court considers whether they properly fall under the basket

provisions for those chapters.

### a.  Basket Provision to Chapter 84, Heading 8479

Chapter 84's basket provision, heading 8479, covers "[m]achines and

mechanical appliances having individual functions, not specified or included elsewhere

in this chapter."  As the Notes to Chapter 84 provide, a machine will fall under heading

8479 if it has a principal function not specifically described in another heading of

Chapter 84 or 85, "unless the context otherwise requires."  *See* Notes to Chapter 84.

### i.  "Mechanical Appliances"

Rubbermaid urges that the subject imports' mechanical features remove them

from Chapter 85's basket provision, heading 8543.  The United States responds that

TCells and SaniCells are not "mechanical" because they do not incorporate moving

parts.  (Def.'s Cross Mot. 16-23.)  Rubbermaid disputes whether a product must include

a moving part to be "mechanical," but urges that TCells and SaniCells satisfy the

government's definition regardless.  (Pl.'s Mot. Summ. J. 22-24.)  Specifically,

Rubbermaid argues that TCells and SaniCells incorporate six moving parts: (i) the

hydrogen gas, which moves from one chamber to another, pushing out the fragrance oil

and cleaning fluid, (ii) the fragrance oil and cleaning fluid, which move from the refill into

the surrounding environment, (iii) the switch on the TCell's circuit board, which allows a

user to set the pace for emitting the fragrance, (iv) the plastic pull tab on the TCell refill,

(v) the front housing cover of the TCell, which opens on a hinge, and (vi) the SaniCell

part, which prevents liquid from flowing out of a refill until installation into a dispenser,

alternatively labeled a "ball and spring check valve assembly" by Rubbermaid and "a

bottle cap/closure" by the United States.  (Pl.'s Mot. Summ. J. 22-24; Pl.'s Reply 31-34.)

The United States counters that neither the hydrogen gas nor the fluids in the

refills constitute "moving parts" because they do not transmit force, but passively fill a

space.  (Def.'s Reply 17-18.)  It contends that the electricity, not the hydrogen gas,

generates the motive force that pushes the fluids from the TCells and SaniCells.  (Def.'s

Reply 17-18.)  It urges that the remaining alleged "moving parts" are ancillary to the

TCells' and SaniCells' primary function and insufficient to render them "mechanical"

products.  (Def.'s Cross Mot. 21 n.15; Def.'s Reply 14-16.)

Whether the subject imports satisfy the definition of "mechanical" for the

purposes of heading 8479 (or, for that matter 8424) presents a question of statutory

interpretation for the court.  *See Bausch*, 148 F.3d at 1365-66; *see also Carl Zeiss*, 195

F.3d at 1378.  As a general matter, "mechanical" means "of or relating to machines or

tools."  American Heritage® Dictionary of the English Language (2014), *available at*

https://ahdictionary.com/word/search.html?q=mechanical (last visited Oct. 22, 2014).

Principal definitions of "machine," in turn, indicate that the object in question

incorporates moving parts to do work.  American Heritage® Dictionary of the English

Language (2014), *available at* https://ahdictionary.com/word/search.html?q=machine

(last visited Oct. 22, 2014) (defining "machine" as "a device consisting of fixed and

moving parts that modifies mechanical energy and transmits it in a more useful form");

Merriam-Webster Dictionary (2014), *available at* http://www.merriam-

webster.com/dictionary/machine (last visited Oct. 22, 2014) (defining "machine" as "a

piece of equipment with moving parts that does work when it is given power from

electricity, gasoline, etc.").  Considering these definitions, the court concludes that

TCells and SaniCells must incorporate moving parts to perform work to qualify as "mechanical appliances" under heading 8479.

The hydrogen gas in the subject imports does not satisfy this definition. Though the gas molecules move between chambers and push fluids out of the subject imports, they do so only while the fuel cell circuit is complete, enabling the electrochemical reaction to produce hydrogen gas at a rate established by the selected resistor setting. While the reaction is ongoing, the quantity of hydrogen gas increases, and pressure builds within the subject imports' chambers. The hydrogen gas thus displaces the fragrance and cleaning fluids. If, however, the circuit is disrupted, the production of gas, and the consequent displacement process, halts. It is only the constant production of hydrogen gas, and the accompanying build-up of pressure, that allows work to occur; if the circuit is interrupted, the production of hydrogen gas ceases, the system returns to equilibrium, and no more fragrance oil or cleaning fluid emerges from the second chamber, notwithstanding the continued presence of the hydrogen. In other words, the hydrogen gas moves and exerts pressure only because of the work of the fuel cell in generating additional hydrogen gas. For this reason, the court finds that the fuel cell is the predominant factor in evaluating the operation of TCells and SaniCells. This same logic disqualifies the fragrance oil and cleaning fluid from constituting "moving parts." As a result, TCells and SaniCells are not "mechanical" for the purposes of heading 8479.

The remaining "moving parts" that Rubbermaid identifies likewise fail to qualify TCells and SaniCells as "mechanical appliances." As the parties agree, these devices

release fragrance oil or liquid cleaner by harnessing pressure from hydrogen gas

molecules produced through an electrochemical reaction.  This process is the basis of

TCells' and SaniCells' primary function.  Consequently, the remaining moving parts that

Rubbermaid identifies are ancillary features, subsidiary to the electrochemical process

that releases hydrogen gas.  The various mechanical features therefore cannot control

the subject imports' classification, *Nadel Indus., Inc. v. United States*, 95 F.3d 1092,

1093 (Fed. Cir. 1996) (per curiam) (affirming that product should be classified based on

primary, rather than "incidental" and "ancillary," features), and the subject imports are

not classifiable as mechanical appliances under heading 8479.

> ## ii.  "Machines"

Heading 8479 covers "[m]achines" in addition to "mechanical appliances."  To

avoid redundancy, the drafters must have intended "machines" to broaden the scope of

the basket provision so that it would capture products that are not "mechanical

appliances."  In this context, a broader definition of "machine" than used for defining

"mechanical appliances" is appropriate.  *See also* Notes to Section XVI (providing a

broad definition of machine for purposes of Section XVI).  The Oxford English Dictionary

provides one such definition, describing a "machine" as "[a] structure regarded as

functioning as an independent body, without mechanical involvement."  Oxford English

Dictionary (2014), *available at*

http://www.oed.com/view/Entry/111850?rskey=G51zf8&result=1&isAdvanced=false#eid

(last visited Nov. 12, 2014).  Under this definition, heading 8479 captures a broad range

of machines, including perhaps electrical ones.  The Notes to Chapter 84 contain a

proviso, however, indicating that the context may require classification of some

machines in another provision.  *See* EN to Chapter 84.  The court therefore considers

whether, in this context, the subject imports may be classified elsewhere.

### b.  Basket Provision for Chapter 85, Heading 8543

Because the Explanatory Notes to Chapter 85 and heading 8543 suggest that

the basket provisions for Chapters 84 and 85 operate in juxtaposition to each other, the

court considers whether the subject imports satisfy the criteria to fall under Chapter 85's

basket provision, heading 8543.  *See* EN to Chapter 85; *see also* EN to 8543.  The

United States urges that the subject imports operate electrically and therefore should be

classified under heading 8543, as "[e]lectrical machines and apparatus, having

individual functions, not specified or included elsewhere in this chapter."

The parties dispute whether TCells and SaniCells are "electrical machines," but

agree on how they function.  Thus, the dispute poses no genuine issues of material fact,

revolving instead around the meaning of tariff provisions, which are properly questions

of law for the court to resolve.  *See Bausch*, 148 F.3d at 1365-66; *see also Carl Zeiss*,

195 F.3d at 1378.

With respect to how the subject imports function, the parties agree that, when a

circuit is completed between the cathode and anode of the subject imports' fuel cell, an

electrochemical reaction occurs, creating the hydrogen gas which displaces fragrance

or cleaning fluid located in the chamber adjoining the fuel cell.  (Stip. ¶¶ 5, 6, 12, 13;

Joint Statement ¶ 4.)  The parties further agree that electrons flow through, but do not

enter or leave, the completed circuit and that the electrons are consumed by this

reaction.  (Pl.'s Facts ¶¶ 25-26; Def.'s Resp. Facts ¶¶ 25-26; Joint Statement ¶ 4.)

The parties, however, disagree about whether the transfer of electrons through

the fuel cell's circuit is sufficient for TCells and SaniCells to be classified as "electrical

machines" under heading 8543.  (Def.'s Cross Mot. 7-14; Pl.'s Reply 12-25.)

Rubbermaid argues that TCells and SaniCells are not electrical machines because they

do not require electricity to operate.  (Pl.'s Reply 18-19.)  Rubbermaid contends that the

"sole purpose" of the fuel cell is to produce hydrogen gas, which does not necessitate

an output or input of electrical current.  (Pl.'s Mot. Summ. J. 13; Pl.'s Reply 3, 15.)

Relying on the expert report of Dr. Herman Krier, Rubbermaid distinguishes between "a

battery-type cell" and the fuel cell at issue in this case.  (Pl.'s Reply 3-4, 6.)  It contends

that a battery facilitates an electrochemical reaction that does not produce gas, just "the

flow of electrons, hence electricity," whereas the subject imports' fuel cell facilitates an

oxidation-reduction reaction between zinc and water with the goal of creating hydrogen

gas.  (Pl.'s Reply 3-4, 6.)  Rubbermaid avers that the fuel cells produce hydrogen gas

and a flow of electrons simultaneously, and that the zinc – not electricity – creates the

hydrogen gas by reducing the water molecules in the fuel cell.  (Pl.'s Reply 4-6.)

Rubbermaid considers any electrons freed through this reaction to be incidental to the

production of hydrogen gas by the zinc.  (Pl.'s Reply 4-6.)  Thus, Rubbermaid

concludes, TCells and SaniCells are not electrical in nature.  (Pl.'s Reply 18-19.)

The United States responds that TCells and SaniCells are electrical machines

because they depend upon the completion of an electrical circuit, which permits the flow

of electrons to reduce water, releasing the hydrogen gas, which pushes the fragrance or

cleaning fluid out of the subject imports.  (Def.'s Reply 2, 5, 12.)  If the circuit did not

enable the flow of electrons, no oxidation-reduction reaction could occur to produce the

hydrogen gas.  (Def.'s Reply 2, 5.)  Because the hydrogen is created by electrical, as

opposed to mechanical, means, the United States contends that the subject imports

qualify as electrical machines.  (Def.'s Reply 2, 5.)

For TCells and SaniCells to be "electrical" machines under heading 8543, the

relevant Explanatory Notes advise that they must "depend for their operation on the

properties or effects of electricity."  EN to Chapter 85.  According to the American

Heritage Science Dictionary, "electrical" means "relating to or operated by electricity."

The American Heritage® Science Dictionary (2002), *available at*

http://dictionary.reference.com/science/electricity (last visited Oct. 22, 2014); *see also*

Merriam-Webster Dictionary (2014), *available at* http://www.merriam-

webster.com/dictionary/electrical (last visited Oct. 22, 2014) (defining "electrical" as "of

or relating to electricity").  The term "electricity," in turn, means "[t]he collection of

physical effects related to the force and motion of electrically charged particles, typically

electrons, through or across matter and space."  The American Heritage® Science

Dictionary (2002), *available at* http://dictionary.reference.com/science/electricity (last

visited Oct. 22, 2014); *see also* Collins English Dictionary (2012), *available at*

http://dictionary.reference.com/browse/electricity (last visited Oct. 22, 2014) (defining

"electricity" as "any phenomenon associated with stationary or moving electrons, ions,

or other charged particles").  Thus, the definition of "electricity" contemplates a broad

swath of electrons' effects, and nothing in the definition indicates that electrons must

enter or leave a closed system to qualify as "electricity."  In the subject merchandise,

the effects of electrons are at play when a complete circuit forms in the subject imports'

fuel cells; the hydrogen gas is released when water is reduced as a result of reacting

with electrons freed in the zinc oxidation reaction.  The other effect is that the hydroxyl

ions created in the reduction reaction react with the zinc, oxidizing the zinc (creating

zinc oxide).  That oxidation creates additional free electrons that, in turn, reduce more

water.  Thus, the reaction in the subject imports' fuel cells involves the effects of

electrons – and of "electricity" – rendering the subject imports "electrical" in nature.

The parties dispute, however, whether TCells and SaniCells "depend" on

electricity to operate, as the pertinent Explanatory Notes advise.  Rubbermaid argues

that the transfer of electrons between water and zinc in the fuel cell is incidental to the

creation of hydrogen gas and that the subject imports "depend" on the hydrogen gas,

not electricity, to operate.  (Pl.'s Reply 4-6.)  The United States urges that the transfer of

electrons is essential to the generation of the hydrogen gas without which the subject

imports could not operate.  (Def.'s Reply 7-11.)  The dispute thus centers on what it

means to "depend" on the effects of electricity for the purposes of Chapter 85's

Explanatory Notes.

The term "depend" means "[t]o be determined, influenced, or contingent" on or

upon.  The American Heritage® Dictionary of the English Language (2014), *available at*

https://ahdictionary.com/word/search.html?q=depend (last visited Oct. 22, 2014).  Here,

the creation of hydrogen gas is contingent on the flow of electrons.  For the desired

hydrogen gas to form, electrons must flow through the circuit between the anode and

the cathode, where they reduce the water, resulting in the release of hydrogen gas.

Absent this transfer of electrons which liberates the hydrogen molecules, pressure from

hydrogen gas would not push fragrance or cleaning fluid into the ambient environment.

The production of hydrogen gas – and the operation of TCells and SaniCells – thus

depends upon the movement of electrons and, therefore, upon electricity.

The role of the resistors in TCells and SaniCells further supports this conclusion.

In both products, the resistor settings regulate the flow of electrons through the circuit

and thereby determines the lifespan of the fragrance or cleaner refill.  The more

electrons flow through the circuit, the faster the water and zinc in the fuel cell are

consumed by the electrochemical reaction.  (Joint Statement ¶ 7.)  The fact that the

refills' lifespan depends on the rate of electron flow underscores the electrical nature of

the products.  As a result, TCells and SaniCells meet the criteria to be classified as

"electrical" machines under the basket provision of Chapter 85 because they "depend

for their operation on the properties or effects of electricity."  EN to Chapter 85.

The conclusion that TCells and SaniCells may properly fall in Chapter 85's

basket provision requires careful consideration of the relationship this provision bears to

its counterpart in Chapter 84.  As noted above, the basket provision for Chapter 84,

heading 8479, ostensibly covers all "machines" that are not more specifically covered in

another heading of Chapter 84 or 85 "unless the context otherwise requires."  Notes to

Chapter 84.  Reading 8479 so broadly as to cover machines such as those that are

classifiable in Chapter 85's basket provision contradicts the cannon of statutory

interpretation that cautions against interpreting one provision of a statute so as to nullify another.  *See Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1362 (Fed. Cir. 2000) ("It is a long-held tenet of statutory interpretation that one section of a law should not be interpreted so as to render another section meaningless.").  Other than the first four words ("Machines and mechanical appliances" as compared to "Electrical machines and apparatus"), the terms of headings 8479 and 8543 are identical ("having individual functions, not specified or included elsewhere in this chapter").  Consequently, heading 8479 must be interpreted to exclude "electrical machines and apparatus" to avoid sweeping all products into it that could fall under heading 8543.  While the term "machine" may allow heading 8479 to capture products that are not "mechanical appliances" and that do not have a predominantly electrical function, it should not be construed so as to swallow heading 8543.

The court therefore concludes that the reference to context in the Notes to Chapter 84, and the traditional rules of statutory construction, lead to the conclusion that TCells and SaniCells are properly classified under Chapter 85's basket provision. TCells and SaniCells are "electrical machines" because they depend on the effects of electricity to operate.  Any of their "mechanical" features are subsidiary to their electrical function, and no more specific provision of Chapter 84 removes them from Chapter 85.

## CONCLUSION

For the reasons stated above, Customs properly classified the subject imports in

8543.90.88, HTSUS, subject to duty at 2.6 percent *ad valorem*.  The court denies

Rubbermaid's motion for summary judgment and grants Defendant's cross-motion for

summary judgment.  Judgment will be entered accordingly.


/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: December 2, 2014
          New York, New York